

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-13-2009

# Raymond Calvitti v. Anthony & Sylvan Pools Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-2790

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

## Recommended Citation

"Raymond Calvitti v. Anthony & Sylvan Pools Corp" (2009). *2009 Decisions.* Paper 263.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/263

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 08-2790/2923
_____

RAYMOND CALVITTI,

Appellant

v.

ANTHONY & SYLVAN POOLS CORPORATION; TRUST UNDER
SUPPLEMENTAL RETIREMENT PLAN OF KDI SYLVAN POOLS, INC;
TRUSTEE MICHAEL T. SPRENGER


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cv-03196)
District Judge:  Honorable Legrome D. Davis

_____

Argued July 8, 2009

Before:   SLOVITER, AMBRO and JORDAN, *Circuit Judges.*

(Filed: November 13, 2009)
_____

Michael G. Trachtman   [ARGUED]
Mary J. Pedersen
Powell Trachtman Logan Carrle
   & Lombardo, P.C.
475 Allendale Road
King of Prussia, PA   19406
        *Counsel for Appellant*

William T. Hangley   [ARGUED]
Michael Lieberman
Bonnie M. Hoffmah
Hangley Aronchick Segal & Pudlin
One Logan Square - 27th Floor
Philadelphia, PA   19103
  *Counsel for Anthony & Sylvan Pools Corporation*

Michael T. Sprenger, Esq.
Suite 300
6690 Beta Drive
Mayfield Village, OH 44143
  *Pro Se Attorney Michael T. Sprenger*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Raymond Calvitti appeals orders of the United States District Court for the Eastern District of Pennsylvania dismissing his complaint against Anthony & Sylvan Pools Corporation ("A&S") and an affiliated trust and trustee.  Because Calvitti entered into an unambiguous agreement releasing those parties from any claim, we will affirm.

## I. Background

Calvitti served as the President of KDI Sylvan Pools, Inc. ("KDI"), the predecessor in interest to A&S.[1]  On April 12, 1993, KDI created a Supplemental Retirement Plan (the "Plan") designed to "reward Raymond J. Calvitti ... for his loyal and continuous service to

---

[1] For ease of reference, appellee A&S is referred to hereafter by the name of its predecessor in interest, KDI.

2

the Company by providing supplemental retirement benefits." (App. 31.) As part of the Plan, KDI created a trust (the "Trust") and agreed to make periodic contributions to it. The Plan stated that when Calvitti reached the age of 65 and was no longer working for KDI, the Company would "pay him an amount equal to the fair market value of the assets in the Trust as of such date." (App. 32.)

Under the Plan, Calvitti's benefits were to be paid from KDI's assets, not the Trust.[2] The Trust served only as a measuring stick for the amount Calvitti was due under the Plan. The Trust Agreement further emphasized that Calvitti did not have any claim to, or interest in, the assets in the Trust.[3]

---

[2] Sections 15 and 16 of the Plan read as follows:

> 15. All benefits to be provided pursuant to this Plan are general, unfunded obligations of the Company. Neither Employee nor his beneficiary will have any interest in any specific asset of the Company as a result of this Plan.

> 16. Benefits under this Plan will be paid from the general assets of the Company. The assets of the Trust shall not, under any circumstances, be deemed to be an asset of this Plan, but at all times shall remain a part of the general assets of the Company, subject to claims of the Company's general creditors.

(App. 34.)

[3] Section I (d) of the Trust Agreement reads as follows: "... Plan participant and his beneficiary shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. All rights created under the Plan and this Trust Agreement shall be mere unsecured contractual rights of the Plan participant and his beneficiary against Company ... ." (App. 37.)

3

In October 1995, KDI terminated Calvitti for cause. The following month, Calvitti and KDI entered into an "Agreement and Release" (the "Agreement") designed to resolve all issues and disputes between them and sever their relationship amicably. In the Agreement, KDI agreed to (1) waive all claims it had against Calvitti as a result of his misconduct;[4] (2) pay Calvitti a lump sum of $33,333.33; (3) pay Calvitti $3,846.15 per week from October 30, 1995 to June 30, 1996 (roughly $134,000); and (4) pay Calvitti's health insurance expenses through June 30, 1996. (App. 86-89.)

In return, Calvitti agreed to release KDI and its affiliated entities from any claims he may have had against them. The release provides as follows:

> For and in consideration of the monies and Benefits paid to EMPLOYEE [Calvitti] by EMPLOYER [KDI], ... and for other good and valuable consideration, EMPLOYEE hereby waives, releases and forever discharges EMPLOYER ... and the Supplemental Retirement Plan of KDI Pools, Inc., their assigns, predecessors, successors, trustees, and affiliated entities ... from any and all claims, suits, debts, dues, accounts, ... contracts, ... agreements, promises, claims, ... or causes of action of any kind or nature whether in law or equity, ... including, but not limited to ... claims arising under ... the Employment Retirement Income Security Act of 1974

---

[4] Attachment 1 to the Agreement is a list of actions for which KDI might have had claims against Calvitti, including (1) defalcation of an amount in excess of $60,000; (2) awarding improper referral bonuses; (3) non-business related distribution of sports tickets paid for by KDI; (4) payment of non-business related dues, fees, and other country club expenses with KDI funds; (5) payment of non-business related expenses for golf trips, green fees, and dinners with KDI funds; (6) improper use of KDI employees, materials, and equipment for personal projects; and (7) improper use of KDI equipment and employees for the benefit of a related company. Presumably, the listed actions are also the reasons that Cavitti was fired.

4

> (ERISA) ... and any and all other claims arising under federal, state or local law ... whether known or unknown; provided, however that parties do not release each other from any claim of breach of the terms of this Agreement and Release.

(App. 87-88 (emphasis in original).) By its terms, the Agreement specifically released KDI and its successors and affiliated entities from claims brought under ERISA.

Another section of the Agreement stated that KDI would have no further obligation to make any additional contributions to the Trust.[5] The Agreement also contained a provision advising Calvitti to consult an attorney, stating that he had been given 21 days to consider the Agreement, and giving him seven days to rescind the Agreement after signing it. (App. 91.)

On August 2, 1996, after KDI had fully performed under the Agreement, Calvitti, who had not yet reached the age of 65, requested that KDI pay him the sums held in the Trust. KDI's attorney responded simply that KDI had "determined to continue administration of the Plan according to its terms." (App. 59.) In 2007, Calvitti turned 65 and again requested the sums held in the Trust. Calvitti's request was denied, and he filed suit in the United States District Court for the Eastern District of Pennsylvania, alleging violations of ERISA and various common law claims. The complaint was later amended to add the Trust and Trustee as defendants.

---

[5] Subsection (5) of the Agreement states: "It is agreed that EMPLOYER shall have no obligation to make any additional contributions to the Trust established pursuant to the Supplemental Retirement Plan of KDI Pools, Inc." (App. 87.)

KDI filed a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Calvitti's First Amended Complaint for failure to state a claim. In an order dated June 2, 2008, the District Court granted the motion, finding that Calvitti had unambiguously released all his claims – including ERISA claims – against KDI. The Court noted that, in fighting dismissal of his complaint, Calvitti had limited his arguments to the interpretation of the Agreement and had not challenged whether the Agreement was entered into knowingly and voluntarily. The Court also held that Calvitti's common law claims were preempted by ERISA.

On June 9, 2008, the Trust and Trustee filed a motion to dismiss, which the Court granted on June 24. Calvitti separately appealed the District Court's orders dismissing his claims against KDI and the Trust and Trustee, and his appeals have been consolidated for disposition. On appeal, he argues that he did not relinquish his claims to the money held in the Trust.

## II.    Discussion[6]

We review *de novo* the District Court's decision to grant a motion to dismiss. *Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). In deciding a motion to dismiss under Rule 12(b)(6), a trial court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether,

---

[6] The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* at 233 (quotation omitted).

We apply federal law to the interpretation of contracts affecting ERISA benefits. *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Retirement Plan*, 167 F.3d 709, 711 (1st Cir. 1999); *see also Fisher Dev. Co. v. Boise Cascade Corp.,* 37 F.3d 104, 108 (3d Cir. 1994) (citation omitted) ("It is, of course, well settled that federal law governs issues relating to the validity of a release of a federal cause of action."). That law includes the general contract principle that "an unambiguous agreement should be enforced according to its terms." *McDowell v. Phila. Housing Auth.*, 423 F.3d 233, 238 (3d Cir. 2005). Whether an agreement is ambiguous is a question of law for the court to decide after considering whether, from an objective standpoint, the agreement is reasonably susceptible to at least two different interpretations. *See id.* In making that determination, the court should consider the language of the agreement, the interpretations suggested by the parties, and the extrinsic evidence offered in support of each interpretation. *Einhorn v. Fleming Foods of Pa., Inc.*, 258 F.3d 192, 194-95 (3d Cir. 2001). Although we consider extrinsic evidence to determine whether a contract is ambiguous, "[i]n no event may extrinsic evidence be employed to contradict explicit contract language or to drain an agreement's text of all content save ink and paper." *Smart v. Gillette Co. Long Term Disability Plan*, 70 F.3d 173, 180 (1st Cir. 1995).

The contract language at issue is, again, as follows:

7

"EMPLOYEE [Calvitti] hereby waives, releases and forever discharges ...[KDI], ... the Supplemental Retirement Plan of [KDI], their assigns, predecessors, successors, trustees, and affiliated entities ... from any and all claims, suits, debts, dues, accounts, ... charges, complaints, damages, sums of money ... or causes of action of any kind ... including but not limited to ... claims arising under the Employee Retirement Income Security Act of 1974 (ERISA) ... ."

(App. 87-88.)

Not surprisingly, the parties suggest very different meanings for the Agreement's language. The Appellees contend that Calvitti waived all his claims against them, including claims brought under ERISA for proceeds from the Plan. Calvitti, on the other hand, asserts that the Agreement does not affect his right to the assets set out in the Plan. In support of his position, he observes that the Agreement also releases KDI from continuing to make payments into the Trust and maintains that such a release would be unnecessary if he no longer had a claim to the assets in the Trust.

He also avers that extrinsic evidence supports his reading of the Agreement. Calvitti alleges that after the effective date of the Agreement, KDI made an additional contribution to the Trust of a sum that had accrued before the Agreement was entered. He argues that KDI had no reason to make that contribution if he had released his interest in the Trust and the assets in the Trust had reverted back to KDI. Calvitti also contends that when he requested the assets in the Trust before turning 65, KDI responded with a letter stating that the Plan would continue to be administered according to its terms. He argues that if, under the Agreement, he had released his right to the assets in the Trust and

8

they had reverted back to KDI, then KDI would have said so in its letter. Instead, Calvitti argues, KDI responded in a manner consistent with his claim that he did not release his right to the assets in the Trust.

Despite Calvitti's attempts to add ambiguity, we conclude that the language of the Agreement clearly supports the interpretation advanced by KDI, the Trust, and the Trustee. Calvitti expressly released KDI, the Plan, and their affiliated entities, which includes the Trust and Trustee, from all claims, including specifically ERISA claims. The provision releasing KDI from its obligation to continue funding the Trust is simply the type of belt-and-suspenders provision that has become common in modern contracts and does not change the unambiguous nature of the release. Likewise, the extrinsic evidence presented by Calvitti does not infuse ambiguity into the clear language of the Agreement. KDI's post-agreement contribution to the Trust was a single event, probably no more than a mistake but certainly not a course of performance. It does not call into question the clearly expressed release. Similarly, KDI's letter stating that the Plan would continue to be administered according to its terms, while not a model of clarity, does not imply that Calvitti had any further interest in Plan proceeds or any interest at all in the Trust.

In language as plain as can be, both the Plan and Trust Agreement state that Calvitti never had any interest in, or right to, the assets in the Trust. His claims to Plan proceeds were against KDI, and he waived all his claims when he signed the Agreement.

9

## III. Conclusion

Calvitti specifically waived any and all claims, including ERISA claims, against KDI, the Plan, and their affiliated entities. The Agreement cannot be reasonably interpreted otherwise. Accordingly, we will affirm the District Court's orders dismissing Calvitti's claims.

Raymond Calvitti v. Anthony & Sylvan Pools Corporation

Nos. 08-2790/2923

AMBRO, Circuit Judge, dissenting

This case asks a simple question: are the words of a release so certain that no confusion can exist as to their meaning, and ultimately the parties' intent. My colleagues believe (along with the District Court) that the words of the release here are so clear that no reasonable person can confuse the intent of KDI and Calvitti.[7] That belief is both plausible and well stated: Calvitti released KDI, the Plan and the "Trustees" of the Plan from all "claims, . . . agreements, . . . or causes of action" of any kind, including ERISA claims. But if that belief is so certain, why is it that the parties acted otherwise after the release was signed?

---

[7]Unless otherwise noted, terms defined by the majority are used here.

10

Words are the parties' attempt to communicate their intent. If the intent of the Agreement and Release signed by Calvitti and KDI were to release the monies left in the Trust (approximately $275,000) as of the date of the release (October 30, 1995), it misfits reason that all actions by KDI within months after the release indicated its understanding that the monies in the Trust someday would be Calvitti's. KDI made post-release an additional contribution to the Trust to complete its funding obligation under the Plan that existed before the release. This KDI did in the face of specific language in the release that absolved it of any "obligation to make any additional contributions to the Trust established pursuant to the [P]lan." (App. 87.) And again, in August 1996, Calvitti formally asked that the funds then in the Trust be given to him. KDI's general counsel, the same person who signed the release on behalf of KDI less than a year earlier, responded that KDI had "determined to continue administration of the Plan according to its terms." Street sense simply would expect a response by KDI to Calvitti that he released his rights to the Trust monies. Not only was there no such response, KDI appeared to have agreed then with what Calvitti asserts was the parties' intent.

But my colleagues say the words of the release counter the post-release actions of the parties and the claims of Calvitti. "In language as plain as can be, both the Plan and Trust Agreement state that Calvitti never had any interest in, or right to, the assets in the Trust. His claim to Plan proceeds were against KDI, and he waived all his claims when he signed the [release]." Maj. Op. at 9. The implication is that no reasonable person

11

could believe other than that Calvitti waived his rights to the monies remaining in the Trust.

But KDI was reasonable, and it <u>acted</u> otherwise. Calvitti did as well. There are thus before us competing meanings of the release. "To choose between . . . competing meanings, we can consider extrinsic evidence of the parties' understanding of [the release]. An important source of such evidence is the parties' performance of the agreement," as it "can . . . demonstrate a latent ambiguity in the contract, which itself is a basis upon which to deny summary judgment." *Smith v. Hartford Ins. Group*, 6 F.3d 131, 138–39 (3rd Cir. 1993) (citations omitted). Moreover,

> [t]o decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. . . . Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.

*Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir. 1993) (citations omitted). *Accord Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 139 (3d Cir. 2001). If this is the case with respect to summary judgment, how much more so is it at the motion to dismiss stage.

In the end my colleagues may be right – these post-release acts may have been simply "mistake[s]." Maj. Op. at 9. My suspicion otherwise – strong as it is that sophisticated principals would not have acted against their self-interest so starkly, and so

12

soon, after the release – may prove wrong.  But my colleagues' beliefs, and my skepticism, are irrelevant at the Rule 12(b)(6) stage.  All that counts there are that we take Calvitti's assertions of fact at face and determine whether, despite that, he cannot win as a matter of law.  With the facts of our case, at the least this calls for discovery.  None was had here.  Without it, Calvitti's statements stand, and there is nothing to counter them but the words of a release the meaning of which is disputed by the parties.

To conclude, I do not believe that the words of the release are so clear as some believe.  Maybe the release was of all claims Calvitti may have to any assets in the Trust or perhaps it was simply an agreement that KDI need not make additional contributions to the Plan that would arise post-release (thus making sense out of the post-release additional contribution to the Trust of KDI's obligation that arose pre-release).  Perhaps this is some form of trust that prevents the Plan sponsor (KDI), absent its insolvency or the Trust's termination by agreement, from holding back deemed Trust assets to its beneficiary (Calvitti).  (KDI is not insolvent, and nothing in the release triggers Trust termination.)  Perhaps KDI's post-release conduct against its own interest is explainable. When these questions are weighed against the backdrop that (1) a release discharges claims that have arisen at the time of that release, and not future claims, *see Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 56 n.4 (3rd Cir. 2001), thus leaving the question of whether Calvitti's claim for benefits accrued under ERISA prior to the release or when he reached age 65, and (2) even words clear at face are

13

subject to evidence of the parties' contrary intent, a ruling here for either party fails to fit Rule 12(b)(6).

I thus respectfully dissent and would remand this case to the District Court.